IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. 07-14336-CIV-MOORE/LYNCH

HARBOR COMMUNITIES, LLC,

    Plaintiff,

vs.

LANDMARK AMERICAN INSURANCE
COMPANY,

    Defendant.
_____/

## ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; GRANTING IN PART AND DENYING IN PART DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT; DENYING PLAINTIFF AND DEFENDANT'S CROSS-MOTIONS FOR SUMMARY JUDGMENT AS TO COUNT II

THIS CAUSE came before the Court upon Plaintiff's Partial Motion for Summary Judgment (dkt # 16), Defendant's Cross-Motion for Partial Summary Judgment (dkt # 29), Plaintiff's Motion for Partial Summary Judgment as to Count II (dkt # 24), and Defendant's Cross-Motion for Partial Summary Judgment as to Count II (dkt # 39).

UPON CONSIDERATION of the Motions, the Responses, the pertinent portions of the record, and being otherwise fully advised in the premises, the Court enters the following Order.

**I.    BACKGROUND**

This case involves an insurance coverage dispute arising out of the collapse of a building under construction at a condominium construction site. Plaintiff Harbor Communities, LLC ("Harbor") was the owner of a construction project known as Tranquility at Hobe Sound (the "Project"). Pl.'s Statement of Undisputed Material Facts, ¶ 1 (dkt # 17). The initial shell contractor was Macs Construction & Concrete, Inc. ("Macs"). *See* Exhibits to Def.'s Opp. To Pl.'s Mot. for Partial Summ. J., Ex. 8 (dkt # 26). As planned, the Project was to consist of ten buildings

containing a total of 82 condominium units. Pl.'s Statement of Undisputed Material Facts, ¶ 2 (dkt # 17).

On July 22, 2004, a building under construction on the Project ("Building # 9") collapsed. Id., ¶ 12. During the period of construction when the collapse occurred, Harbor was insured by a Builder's Risk Policy # LHQ334573 (the "Policy") issued by Defendant Landmark American Insurance Company ("Landmark"). *See* Id., ¶ 3. The Policy contained a Limit of Insurance of $10,126,000 in hard costs and $2,155,000 in soft costs. After the collapse, Harbor received a letter from the Occupation Safety and Health Administration ("OSHA"), strongly recommending that Harbor take specific measures during demolition of Building # 9 to minimize demolition hazards and to preserve evidence needed to determine the cause of the collapse. *See* Exhibits to Def.'s Opp. To Pl.'s Mot. for Partial Summ. J., Ex. 8 (dkt # 26). Harbor hired The BG Group to conduct a forensically engineered demolition of Building # 9. Pl.'s Statement of Undisputed Material Facts, ¶ 11 (dkt # 17). Capri Engineering subsequently released a report concerning the results of the investigation carried out pursuant to the forensic demolition. Exhibits to Def.'s Opp. To Pl.'s Mot. for Partial Summ. J., Ex. 5 (dkt # 26).

On August 2, 2004, Florida's Division of Workers' Compensation issued Macs a Stop Work Order for failure to secure the payment of workers' compensation. Exhibits to Def.'s Opp. To Pl.'s Mot. for Partial Summ. J., Ex. 8 (dkt # 26). After the Stop Work Order issued, Harbor obtained a different shell contractor to complete the project. *See* Pl.'s Statement of Undisputed Material Facts, ¶ 14 (dkt # 17). In a letter dated November 19, 2004, the Martin County Board of County Commissioners (the "Commissioners") advised Harbor that the Building Department was reviewing revised drawings of the Project's buildings, and instructed Harbor to cease construction

because the drawings had not been approved. Exhibits to Def.'s Opp. To Pl.'s Mot. for Partial Summ. J., Ex. 14 (dkt # 26). The Commissioners further advised Harbor that the expected completion date for review of the drawings of Buildings 1, 3, and 4 was December 3, 2004, with review of the remaining buildings to be completed by December 10, 2004. Id. In response to Harbor's claims under the Policy, Landmark paid Harbor a total amount of $859,523.53. Pl.'s Statement of Undisputed Material Facts, ¶ 11 (dkt # 17); Exhibits to Def.'s Opp. To Pl.'s Mot. for Partial Summ. J., Ex. 9 (dkt # 26). Harbor alleges that after the amount paid by Landmark, Harbor is still entitled to recover an additional $9,824,631.46.

Harbor subsequently filed a complaint for declaratory relief and damages in state court. Harbor Communities, LLC v. Landmark Am. Ins. Co., Case No. 07-846CA (Fla. 19th Judicial Cir. Ct., Martin County 2007). Defendant filed a Notice of Removal on October 31, 2007 (dkt #1). Harbor and Landmark also filed separate claims in state court against the same third-party tortfeasor seeking recovery for damages arising out of the collapse. Compl., ¶ 21. These actions were consolidated and are now pending. Def.'s Statement of Undisputed Material Fact, ¶ 19 (dkt # 37).

## II. STANDARD OF REVIEW

The applicable standard for reviewing a summary judgment motion is unambiguously stated in Rule 56(c) of the Federal Rules of Civil Procedure:

> The judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

Summary judgment may be entered only where there is no genuine issue of material fact. Twiss v.

Kury, 25 F.3d 1551, 1554 (11th Cir. 1994). The moving party has the burden of meeting this exacting standard. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). An issue of fact is "material" if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997). An issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party. Id.

In applying this standard, the district court must view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion. Id. However, the nonmoving party "may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

### III.   ANALYSIS

#### A.   Policy Coverage - Hard Costs

Harbor and Landmark disagree concerning the scope of the Policy's coverage. The policy provides coverage for "loss or damage to Covered Property from any of the Covered Causes of Loss." Builder's Risk Coverage Form, #LHQ334573, Section A. "Loss or damage" is defined as "accidental loss or damage." Id., Section F. "Covered Property" includes:

> a. Property, including materials, supplies, machinery, fixtures and equipment which will become a permanent part of buildings or structures in the course of construction . . . .

4

>    (1) Excavations, grading or filling; and
>
>    (2) Underground flues, pipes, drains, piers or pilings;
>
>    If such costs are included in the Limits of Insurance.
>
>    b.  Scaffolding, construction forms and temporary structures if a Limit of Insurance is shown on the Declarations. This may be your property or the property of others for which you are responsible.

Id., Section A(1). "Covered Causes of Loss" is defined as "risks of direct physical loss or damage to Covered Property except those causes of loss or damage listed in the exclusions." Id., Section A(5). The coverage provided in the foregoing provisions constitutes coverage for hard costs. *See* Additional Expense - Soft Cost Coverage Endorsement, #LHQ334573.

Harbor alleges that Landmark has failed to provide compensation under the Policy for (1) the full demolition and debris removal costs of Building # 9 and the other buildings that were demolished after the collapse, (2) the cost of rebuilding Building # 9 to its pre-collapsed condition, (3) the increased costs incurred in the construction of the other buildings, (4) the additional costs of securing the Project site after the collapse, and (5) the additional fees, costs and expenses incurred as a result of the collapse. Compl., ¶ 15.

   1.  Loss or Damage

"Loss or damage" is defined as "accidental loss or damage." Builder's Risk Coverage Form, #LHQ334573, Section F. Therefore, the Policy provides coverage only if the collapse of Building # 9 was accidental. The Policy does not define the term "accidental." "When an insurer fails to define a term in a policy, . . . the insurer cannot take the position that there should be a 'narrow, restrictive interpretation of the coverage provided.'" State Comprehensive Health Ass'n v. Carmichael, 706 So.2d 319, 320 (Fla. 4th DCA 1997) (quoting Budget Rent-A-Car Sys., Inc. v. Gov't Employees Ins. Co., 698 So.2d 608, 609 (Fla. 4th DCA 1997)). Moreover, where "particular policy language is susceptible to differing interpretations, it . . . should be construed in favor of the insured. Container Corp. of Am. v. Md. Cas. Co., 707 So.2d 733, 736 (Fla. 1998); *see* Berkshire

5

Life Ins. Co. v. Adelberg, 698 So.2d 828, 830 (Fla. 1997). The term "accidental" is susceptible to varying interpretations and should be construed liberally in favor of Harbor and strictly against Landmark. *See* State Farm Fire & Cas. v. CTC Dev. Corp., 720 So.2d 1072, 1076 (Fla. 1998) (holding that the term "accident," when undefined in a liability policy, is susceptible to varying interpretations and should be construed in favor of the insured).[1]

Where a policy fails to define the term "accident," the term "encompasses not only 'accidental events,' but also injuries or damage neither expected nor intended from the standpoint of the insured." Assurance Co. of Am. v. Lucas Waterproofing Co., Inc., 07-14084 (KMM), 2008 WL 1927365, at *5 (S.D.Fla. 2008) (quoting State Farm Fire & Cas. v. CTC Dev. Corp., 720 So.2d 1072, 1076 (Fla. 1998)). The Parties disagree concerning the cause of the collapse. Plaintiff alleges that the cause is still unknown. Pl.'s Statement of Undisputed Material Facts, ¶ 10 (dkt # 17). Defendant alleges that the collapse was due to "the inherent instability in the design of the building and improper shoring and re-shoring during the construction process." Def.'s Res. to Pl.'s Statement of Undisputed Material Facts, ¶ 8 (dkt # 27). This factual disagreement is not a material fact with respect to a determination of whether the collapse was "accidental." Taking each party's allegation in the light most favorable to the non-moving party, neither position supports the conclusion that Harbor expected or intended Building # 9 to collapse. The fact that a subsequent forensic investigation was able to determine the cause of the collapse does not make the event expected or intentional. The same can be said for an accidental plane crash, where forensic examiners are later able to ascertain the cause of the crash. Therefore, the collapse of Building # 9 was "accidental" within the meaning of the Policy and therefore constitutes "loss or damage."

Plaintiff also alleges that the Policy covers costs associated with the demolition of "other

---

[1] Although the Court in State Farm reached this conclusion while interpreting a liability policy, this Court sees no reason why the principle does not apply with equal force to a builders' risk policy.

affected non-salvageable buildings." Compl., ¶ 15. However, it is unclear from the pleadings and other supporting materials which other buildings were demolished and why their demolition was undertaken. While the pleadings and other supporting documents suggest that other buildings already under construction at the time of the collapse were demolished because the collapse demonstrated that it would have been unsafe to continue construction on the other buildings already underway, such speculation is insufficient to assess the scope of coverage on summary judgment. Therefore, this Court makes no findings on "loss or damage" to structures other than Building # 9.

2. Covered Property

Harbor is entitled to recover for "loss or damage" to "Covered Property" as long as the "loss or damage" was caused by a "Covered Cause of Loss." Builders' Risk Coverage Form, #LHQ334573, Section A. The policy provides an expansive definition of "Covered Property" and includes virtually all physical materials that will become a part of structure, terrain preparation including excavation, grading and filling, underground infrastructure including underground flues, pipes, drains, piers or pilings, and temporary structures including scaffolding and construction forms. Builders' Risk Coverage Form, #LHQ334573, Section A. Despite the Policy's breadth with respect to physical materials, the Policy's definition of "Covered Property" makes no reference to any services. Therefore, given that the collapse of Building # 9 constitutes "loss or damage," the Policy provides coverage for all the "Covered Property" listed above, as long as the "loss or damage" was caused by a "Covered Cause of Loss."

3. Covered Causes of Loss

Given that Harbor has suffered "loss or damage" to "Covered Property," the only remaining question with respect to coverage is whether the "loss or damage" to "Covered Property" was caused by a "Covered Cause of Loss." The Policy describes "Covered Causes of Loss" as "risks of

direct physical loss or damage to Covered Property except those causes of loss or damage listed in the Exclusions." Builders' Risk Coverage Form, #LHQ334573, Section A(5). This description of "Covered Causes of Loss" includes the collapse of Building # 9 because the collapse was the direct cause of the physical loss of Building # 9 and risk of collapse is inherent in the construction of most structures. Therefore, the Policy provides coverage for the collapse of Building # 9 and for damages to "Covered Property" that occurred as a result.

Plaintiff also alleges that the costs associated with demolition of "other affected non-salvageable structures" and the "[i]ncreased costs of constructing . . . the other structures" are "Covered Causes of Loss" because they were a direct result of the collapse of Building # 9. Compl., ¶ 15. "Covered Causes of Loss" incorporates the term "loss or damage" in its definition. Therefore, in order to determine if an event is a "Covered Cause of Loss," it is necessary to make a finding concerning whether the demolition of other structures was accidental . However, it is unclear from the pleadings and other supporting materials which other buildings were demolished, why their demolition was undertaken, and why there was a resulting increase in the costs of construction. This Court is therefore unable to determine if the demolition of other buildings and the increased costs of reconstruction constitutes a "Covered Cause of Loss." Furthermore, because of the uncertain nature of the causal relationship between the collapse of Building # 9 and the demolition of other buildings and the increased costs of their reconstruction, this Court cannot determine if these claims constitute "direct physical loss or damage." Therefore, there are material issues of fact concerning whether the costs of demolition of other buildings and increased construction costs of other buildings were "Covered Causes of Loss" within the meaning of the policy.

    4. Debris Removal

The policy provides coverage for debris removal, stating "[w]e will pay your expense to

remove debris of Covered Property caused by or resulting from a Covered Cause of Loss that occurs during the policy period." Builders' Risk Coverage Form, #LHQ334573, Section A(7)(a)(1). "The most we will pay under the Coverage Extension is: (a) 25% of the amount we pay for the direct loss or damage, plus (b) [t]he Deductible in this policy applicable to that loss or damage. Id., at A(7)(a)(2). "Debris removal" is not defined in the policy. "When an insurer fails to define a term in a policy, . . . the insurer cannot take the position that there should be a 'narrow, restrictive interpretation of the coverage provided.'" State Comprehensive Health Ass'n v. Carmichael, 706 So.2d 319, 320 (Fla. 4th DCA 1997) (quoting Budget Rent-A-Car Sys., Inc. v. Gov't Employees Ins. Co., 698 So.2d 608, 609 (Fla. 4th DCA 1997)).

"Debris removal" includes the cost of removing debris from one location to another. "Debris removal" does not include demolition costs because demolition entails the act of destroying or wrecking, acts which do not fit within the meaning of "debris removal." *See* Zurich Am. Ins. Co. v. Keating Building Corp., 513 F. Supp.2d 55, 63-64 (D.N.J. 2007) (holding that demolition costs may not be included within the "debris removal sublimit of a builders' risk policy). Rather, demolition is an event which creates debris that must be removed. Therefore, demolition costs cannot be included in the "debris removal" sublimit. Furthermore, removal of debris from the collapse of Building # 9 is covered because the collapse was a "Covered Cause of Loss" and the debris was "Covered Property." However, this Court makes no finding on coverage for debris removal of other structures because it is has not been determined that the debris of other structures is "Covered Property" resulting from a "Covered Cause of Loss."

B.   Exclusions - Hard Costs

Under Florida law, "exclusionary provisions which are ambiguous or otherwise susceptible to more than one meaning must be construed in favor of the insured, since it is the insurer who usually drafts the policy." State Farm Mut. Auto. Ins. Co. v. Pridgen, 498 So.2d 1245, 1248 (Fla.

9

1986). However, "only when a genuine inconsistency, uncertainty, or ambiguity in meaning remains after resort to the ordinary rules of construction is the rule apposite." Id.

### 1. Design Defect Exclusion

Landmark contends that coverage of Harbor's claims for the increased construction costs of buildings undamaged by the collapse of Building # 9 are precluded by the Policy's design defect exclusion. The Policy's design defect exclusion states:

> 1. We will not pay for loss or damage caused by or resulting from: . . .
>    g. Defective materials; faulty workmanship, error, omission or deficiency in designs, plans or specifications. But if loss or damage by a Covered Cause of Loss results, we will pay for that resulting loss or damage.

Builders' Risk Coverage Form, #LHQ334573, Section B(1)(g). The first sentence of this exclusion is commonly referred to as a design defect exclusion, while the second sentence is typically known as an ensuing loss provision. See Swire Pac. Holdings, Inc. v. Zurich Ins. Co., 845 So.2d 161, 166 (Fla. 2003). In Swire, the Florida Supreme Court stated that "loss or damage" in the first sentence "means loss caused directly by the design defect." Id. The Court further stated that "loss or damage" in the second sentence, the ensuing loss provision, means "damage that occurs subsequent to, and as a result of, a design defect."[2] Id.

These definitions are somewhat obscure, given that they require a party seeking to interpret a design defect exclusion to draw a meaningful distinction between "loss caused directly by a design defect" and "damage that occurs subsequent to, and as a result of, a design defect." See Id. Nevertheless, the Swire Court's subsequent analysis clarified that the design defect exclusion precludes coverage for costs incurred by remediating construction defects that arise because

---

[2] The design defect exclusion at issue in Swire actually used the term "physical loss or damage" in the second sentence, or ensuing loss provision. However, in interpreting this clause, the Court relied heavily on identifying a construction that would meaningfully define the ensuing loss provision without eviscerating the design defect exclusion. Swire, 845 So.2d at 168. Given the Court's reliance on other cases in which the word "physical" did not appear in the ensuing loss provision, the presence of the word "physical" used in conjunction with "loss or damage," does not appear to have contributed significantly to the Court's holding.

construction was carried out in accordance with a design defect. Swire, 845 So.2d at 166-68 (citing Laquila Constr., Inc. v. Travelers Indem. Co. of Ill., 66 F. Supp.2d 543 (S.D.N.Y. 1999)). The design defect exclusion also precludes coverage for loss or damage sustained by an element of a structure into which a design defect has been incorporated, where the loss or damage to the element of the structure is a direct result of the design defect. Id., at 167 (citing Narob Dev. Corp. v. Ins. Co. of North Am., 219 A.D.2d 454 (App. Div. 1st Dept. 1995) (holding that where a retaining wall collapsed due to defective workmanship, the ensuing loss provision did not apply because the collapse was caused by defective workmanship, a risk covered by the exception, and there was no collateral or subsequent damage caused by the wall's collapse). This interpretation of the design defect exclusion still allows for meaningful application of the ensuing loss provision, because any loss or damage that is collateral or subsequent to loss or damage to an element of a structure into which a design defect has been incorporated would still be covered. Id. For example, if the free-standing retaining wall in Narob had collapsed onto an unfinished wooden frame, destroying it, the retaining wall would not be covered because of the design defect exclusion. However, the wooden frame would be covered by the ensuing loss provision because the loss of the frame would be collateral and subsequent to the collapse of the retaining wall incorporating the defective workmanship.

    Therefore, the design defect exclusion in this case excludes coverage for the cost of correcting the plans incorporating the design defects. The exclusion also excludes coverage for any element of the structure incorporating a design defect which directly resulted in the collapse of Building # 9. Therefore, any portion of Building # 9 damaged in the collapse which did not contain a design defect that directly resulted in the collapse is covered. This Court will not attempt to identify the specific elements of Building # 9 which incorporated a design defect that directly caused the collapse. Given the existence of material issues of fact and the technical difficulty

posed by attempting to rely on the expert reports to identify particular elements of the structure containing a design defect that directly caused the collapse, the prudent course is to leave this matter for resolution at trial.

With respect to buildings other than Building # 9, it is unclear from the pleadings and other supporting materials which other buildings were demolished and why their demolition was undertaken. In addition, the specific elements of the structure containing a design defect are unknown at this time . However, assuming *arguendo* that other buildings were demolished because they needed to be rebuilt for safety reasons, and that some portion of the demolished buildings contained structural elements that did not incorporate design defects, the question is whether coverage for costs of replacing non-defective structural elements is precluded by the design defect exclusion, where the costs were necessary to remediate the structural elements incorporating the design defect. For example, if plumbing enclosed behind drywall contains a design defect, and the drywall is destroyed in the process of remediating the plumbing, is coverage for the drywall precluded by the design defect exclusion? The reason for destruction of the drywall would be to remediate a structural element incorporating a design defect and therefore the design defect exclusion applies to the plumbing. However, coverage would nevertheless exist if the ensuing loss provision encompasses the drywall.

Application of the ensuing loss provision depends on whether destruction of the drywall is collateral or subsequent to "loss or damage" to the defective plumbing. The Policy defines "loss or damage" as accidental loss or damage." Builders' Risk Coverage Form, #LHQ334573, Section F(1). When a defective structural element is replaced simply because it is defective, although no harm to the structural element or to other property has occurred, there is no "loss or damage" within the meaning of the Policy because no accident has occurred. *See* <u>Swire</u>, 845 So.2d at 167-68. While the design defect may have been accidental, the pertinent question is whether there is

"loss or damage" and whether such "loss or damage" is accidental. In the case of drywall destroyed to repair defective plumbing, the plumbing has not sustained accidental "loss or damage" where it is voluntarily replaced because it is defective. Therefore, the design defect exclusion precludes coverage for the costs of repairing the plumbing and the drywall is not within the scope of the ensuing loss provision because if there is no "loss or damage" to the plumbing, there can be no collateral "loss or damage" to the drywall.

On the other hand, if a pipe in the plumbing were to burst because of the defect and the drywall was destroyed on account of water damage, the bursting pipe would constitute accidental "loss or damage" and the water damage to the drywall would be collateral to the "loss or damage" to the defective plumbing. The "loss or damage" to the drywall would therefore be covered because it would be within the scope of the ensuing loss provision. Likewise, in a case where a defective retaining wall falls and destroys a wooden frame, the wooden frame would be encompassed by the ensuing loss provision because the "loss or damage" to the wooden frame is collateral and subsequent to the "loss or damage" caused by the accidental collapse of the defective retaining wall. These examples are consistent with <u>Swire</u>, in which $4.5 million was spent to remediate elements of a building under construction that was not in compliance with building codes. These costs were not covered because they were not within the scope of the ensuing loss provision. In <u>Swire</u>, no damage to defective elements of the structure had occurred. The repairs were carried out voluntarily for the sole purpose of bringing the building in compliance with the building codes. The Court thus held that the expenses were not within the scope of the ensuing loss provision because "[n]o loss separate from, or as a result of, the design defect occurred."

Applying these principles to the buildings other than Building # 9 that were demolished, coverage for costs associated with demolition and reconstruction of these other structures are not

13

covered. If the buildings were voluntarily demolished to correct a design defect, no accidental "loss or damage" occurred because the demolition and reconstruction were not accidental, just as the remediation in Swire was not accidental. In the absence of accidental "loss or damage," there can be no collateral "loss or damage" and therefore the ensuing loss provision does not apply. Therefore, if structures other than Building # 9 incorporated design defects, coverage for the costs of remediating these defects through demolition and reconstruction is precluded by the design defect exclusion, and not within the scope of the ensuing loss provision. Therefore, the design defect exclusion bars coverage for demolition and reconstruction of structures other than Building # 9, except to the extent that the collapse of Building # 9 caused direct physical loss or damage to other structures. Accordingly, this finding precludes the need to establish whether coverage exists for the demolition and reconstruction costs of buildings other than Building # 9.

2. Exclusion for Enforcement of a Law or Ordinance

Landmark asserts that the costs of the forensic demolition are not covered by the Policy because coverage is precluded by the exclusion for enforcement of a law or ordinance.[3] The enforcement of a law or ordinance exclusion states:

> 1. We will not pay for loss or damage caused by or resulting from: . . .
>    j. The enforcement of any law or ordinance;
>       (1) Regulating the construction, use or repair of any property;
>       (2) Requiring the tearing down of any property, including the cost of removing debris.

Builders' Risk Coverage Form, #LHQ334573, Section B(1)(j). This analysis concerning the applicability of this exclusion only applies to removal of debris from the collapse of Building # 9 because coverage for the demolition and reconstruction of other structures is precluded by the design defect exclusion. Landmark contends that OHSA's letter to Harbor strongly

---

[3] Defendant concedes that the Policy covers costs of demolition of Building # 9 that are not attributable to the forensic components of the demolition. Def.'s Opp. To Pl.'s Mot. for Partial Summ. J., at 18 (dkt # 29).

recommending that Harbor conduct a forensic demolition to identify the cause of the collapse constitutes a law or ordinance within the meaning of the enforcement of a law or ordinance exclusion. *See* Exhibits to Def's Opp. To Pl's Mot. for Partial Summ. J., Ex. 11 (dkt # 26).

Under Florida law, "a statute [or law] is a form of positive law enacted by the legislative branch of government. Similarly, an ordinance is a form of statutory law enacted by a local government body, such as a county commission or city council." Morin v. Day & Zimmerman NPS, Inc., 06-21928 (KMM), 2008 WL 2543432, at *2 (S.D.Fla. 2008) (quoting Snow v. Ruden, McClosky, Smith, Schuster & Russell, P.A., 896 So.2d 787, 791 (Fla. 2d DCA 2005)). While an ordinance in the context of federal regulation could be described as a form of statutory law enacted by a federal agency, OSHA's letter strongly recommending that Harbor conduct a forensic demolition does not classify as a law or ordinance. Landmark does not point to any specific law or ordinance it alleges OSHA was enforcing by suggesting a forensic demolition. Nor does the language used in the letter suggest that OSHA was writing to inform Harbor that a forensic demolition was required by law. Although OSHA may have had the power to obligate compliance with the request had Harbor refused to undertake a forensic demolition, any unexercised power OSHA may have to mandate compliance with a request is not a proxy for a law or ordinance within the meaning of the enforcement of a law or ordinance exclusion. Therefore, coverage for the costs associated with conducting a forensic demolition are not excluded by the enforcement of a law or ordinance exclusion.

3. Other Exclusions

Landmark claims that other exclusions also apply, including the delay and consequential loss exclusion and the wear and tear exclusion. No analysis of these exclusions is necessary because Landmark does not allege, and this Court is unable to discern, any additional limitations on coverage resulting from these exclusions, nor is there any possibility that additional coverage

could arise from these provisions. *See* State Farm Cas. Co. v. CTC Dev. Corp., 720 So.2d 1072, 1074-75 (stating that "exclusionary clauses cannot be relied upon to create coverage").

B.  Policy Coverage - Soft Costs

Plaintiff seeks coverage under the Policy for "additional costs for securing the site which are directly related to the Collapse of Building # 9" and "[t]he additional fees, costs and expenses incurred as a result of the collapse."[4] Compl., ¶ 15. The Policy's Soft Cost Coverage Form states:

> We cover your additional expense as indicated below which results from a delay in the completion of the project beyond the date it would have been completed had no loss or damage occurred. The delay must be due to direct physical loss or damage to Covered Property and be caused by or result from a Covered Cause of Loss.

Additional Expense -Soft Cost Coverage Form, Section A(1). "Coverage under this endorsement applies only to those items indicated by an 'x' in the box below." Id., at (A)(1)(a). The soft cost coverages marked with an "x" include: Additional Interest Coverage, Additional Real Estate Taxes and Other Assessments; Additional Advertising and Promotional Costs, Additional Commission Expenses, Additional Architectural and Engineering Fees, Additional Licenses and Permit Fees, and Legal and Accounting Fees. Id. None of the descriptions of these additional coverages includes coverage for the costs of securing the premises. Therefore, costs for securing the site are not covered by the Policy.

Plaintiff also claims that coverage exists for "additional fees, costs and expenses incurred as a result of the collapse." Applying the plain language of the Policy to the facts, the Additional Interest Coverage provision of the Soft Cost Coverage Form provides coverage for additional interest on money borrowed to finance the reconstruction of the portions of Building # 9 that did

---

[4] No coverage is provided for these costs under the Builders' Risk Coverage Form because these costs are not "Covered Property."

16

not incorporate a design defect leading directly to the collapse. Id. The Additional Interest Coverage provision only applies to portions of Building # 9 not incorporating a design defect because only these portions of the structure sustained direct physical loss or damage from a Covered Cause of Loss. See Additional Expense -Soft Cost Coverage Form, Section A(1)(a). Aside from the applicability of the Additional Interest Coverage provision, these claims are not described in sufficient detail to discern if the Policy provides coverage or if Landmark has already compensated Harbor for these expenses. Compl., ¶ 15 Therefore, the remainder of Plaintiff's claims pertaining to coverage for soft costs cannot be resolved on summary judgment.

C. Valuation

Harbor claims that Landmark failed to compensate it for the full amount expended to rebuild Building # 9 to its pre-collapsed condition. Pl.'s Mot. for Partial Summ. J., at 3 (dkt # 16). The Policy's valuation provision states:

> We will pay:
>     a. The actual cost to repair, replace or rebuild the damaged property with substantially identical materials; plus
>     b. Reasonable overhead costs, including profit, if these costs are included in the Limit of Insurance shown on the Declaration; or
>     c. The Limit of Insurance shown on the Declarations;
>       Whichever is less.

There is a material issue of fact concerning whether Building # 9 was rebuilt with substantially identical materials. Therefore, there is no means of determining which of the disjunctive provisions to apply to reach an appropriate valuation. Therefore, this matter is reserved for trial.

D. Subrogation

As an initial matter, both Parties have violated the Local Rules of this District by filing multiple motions for summary judgment without prior permission of the Court. L.R. 7.1(C)(2), S.D. Fla. Moreover, the Parties have implicitly violated the Local Rule limiting memoranda of law to 20 pages, because the combined page length of the memoranda of law for the two briefs

for partial summary judgment on each side exceeds the 20 page limit. Id. Nevertheless, in the interest of judicial efficiency, this Court will address the subrogation issues raised in the Parties cross-motions for summary judgment (dkt #'s 24, 39).

Harbor seeks a declaratory judgment barring Landmark from seeking subrogation until Harbor has been made whole. Harbor and Landmark are parties in a consolidated action in state court against the same third-party tortfeasor seeking recovery for damages arising out of the collapse. Compl., ¶ 21. Harbor claims that Landmark is barred from seeking recovery from this third-party tortfeasor until Harbor has been made whole. Pl.'s Mot. for Summ. J. as to Count II, at 2 (dkt # 24).

"The Declaratory Judgment Act is an enabling Act, which confers a discretion on courts rather than an absolute right upon the litigant. Ameritas Variable Life Ins. Co. v. Roach, 411 F.3d 1328, 1330 (11th Cir. 2005). "It only gives the federal courts competence to make a declaration of rights; it does not impose a duty to do so." Id. (citations omitted). "[I]t would be uneconomical as well as vexatious for a federal court to proceed in a declaratory judgment suit where another suit is pending in a state court presenting the same issues, not governed by federal law, between the same parties. Id. (citation omitted). Federal courts have "broad discretion in deciding whether to hear a declaratory judgment action." Atl. Cas. Ins. Co. v. GMC Concret Co., Inc., 07-CV-0563 (WHS), 2007 WL 4335499, at *2 (S.D.Ala. 2007) (quoting Prudential Ins. Co. of Am. v. Doe, 140 F.3d 785, 789 (8th Cir. 1998).

In Ameritas, the Eleventh Circuit provided direction concerning the exercise of discretion by district courts when deciding whether to entertain declaratory judgment actions when there is a parallel proceeding in state court. Ameritas, 411 F.3d at 1331. These factors include:

> (1) the strength of the state's interest in having the issues raised in the federal declaratory action decided in the state courts; (2) whether the judgment in the federal declaratory action would settle the controversy; (3) whether the federal declaratory action would serve a useful purpose in clarifying the legal relations at issue; (4)

whether the declaratory remedy is being used merely for the purpose of 'procedural fencing'-that is, to provide an arena for a race for res judicata or to achieve a federal hearing in a case otherwise not removable; (5) whether the use of a declaratory action would increase the friction between our federal and state courts and improperly encroach on state jurisdiction; (6) whether there is an alternative remedy that is better or more effective; (7) whether the underlying factual issues are important to an informed resolution of the case; (8) whether the state trial court is in a better position to evaluate those factual issues than is the federal court; and (9) whether there is a close nexus between the underlying factual and legal issues and state law and/or public policy, or whether federal common or statutory law dictates a resolution of the declaratory judgment action.

Id.

With respect to subrogation, this Court finds that the Ameritas factors militate in favor of abstention. The subrogation issue is purely a matter of state law that Florida's courts have a greater interest in resolving than does a federal district court. Moreover, in the pending state court action brought by Harbor and Landmark against a third-party tortfeasor, resolution of the subrogation issue directly concerns apportionment of damages against the tortfeasor and is therefore best resolved is the state court action. Addressing the subrogation issue at this stage would also create friction between the federal and state courts because resolution of this claim would resolve an issue relating to apportionment of damages in the state court action prior to the state court reaching the merits of the pending claim. Additionally, resolving the subrogation issue here would not resolve the state court controversy, nor would it substantially clarify the legal relations at issue, because apportionment of damages in the state court claim will only occur subsequent to resolution of the claims on the merits. Finally, the state court is likely to be in a better position to resolve the subrogation claim because Harbor's coverage claims under the Policy will likely be resolved by the time the state court reaches the issue of subrogation. Therefore, this Court abstains from rendering a declaratory judgment on Harbor's subrogation claim.

## IV. CONCLUSION

Based on the foregoing, it is

ORDERED AND ADJUDGED that Plaintiff's Partial Motion for Summary Judgment (dkt # 16) and Defendant's Cross-Motion for Partial Summary Judgment (dkt # 29) are GRANTED IN PART AND DENIED IN PART in accordance with the terms of this Order. It is further

ORDERED AND ADJUDGED that Plaintiff's Motion for Summary Judgment as to Count II (dkt # 24) and Defendant's Cross-Motion for Partial Summary Judgment as to Count II (dkt # 39) are DENIED.

DONE AND ORDERED in Chambers at Miami, Florida, this ___ day of August, 2008

K. MICHAEL MOORE
UNITED STATES DISTRICT JUDGE

cc: All counsel of record